Keith Michael NELSON, Plaintiff
and Appellee,

v.

Jody Lynn NELSON, n/k/a Jody Lynn
Novak, Defendant and Appellant.

Civil No. 950299.

Supreme Court of North Dakota.

May 14, 1996.

Richard A. Ohlsen, Ltd., Brainerd, MN, for plaintiff and appellee; argued by Richard A. Ohlsen. Appearance by Alan M. McDonaugh, Law Clerk.

Karen K. Braaten, Ltd., Grand Forks, ND, for defendant and appellant; argued by Kar-

en K. Braaten. Appearance by Lynn Block, Law Clerk.

MESCHKE, Justice.

Jody Lynn Nelson appeals from a decree decreasing the child support payable by her ex-husband, Keith Michael Nelson. Although we disagree with much of the trial court's reasoning for refusing to impute more income to Keith, we agree with one valid reason and with the result. Therefore, we affirm.

Jody and Keith were married on May 30, 1981, and had two children. Erica Lynn was born on June 7, 1982, and Ashley Nicole was born on June 4, 1987. Keith and Jody were divorced on January 28, 1992. The divorce decree placed custody of the two children with Jody, and ordered Keith to pay $526 monthly child support. In December 1992, the divorce decree was amended when Keith agreed to increase his support payment to $568 monthly.

Before the divorce, Keith worked for the Overhead Door Company as an installer. His 1991 gross income had been $27,130. About June 1992, Keith left Overhead Door to work for the Red River Overhead Door Company. He earned $17,361 in 1992. In June 1993, Keith left Red River to start his own overhead door business. In June 1994, Keith filed bankruptcy. Keith earned $8,292 in 1993, and $10,005 in 1994.

In January 1995, Keith moved to reduce his child support obligation due to a "dramatic reduction of income." Jody resisted, asserting that Keith's income reduction was voluntary and only temporary. Comparing Keith's 1994 "hourly" income to his 1991 hourly wage of $10.50 at Overhead Door, Jody urged that Keith was "underemployed" for application of the North Dakota Child Support Guidelines, see NDAC 75-02-04.1-07, and asked the court to impute more income to Keith if it modified his obligation.

After an evidentiary hearing, the trial court concluded: (1) the underemployment guideline was inapplicable because Keith was "self-employed," not "underemployed"; (2) the underemployment guideline is unreasonable, unnecessary, and not required by feder-

al law, and a court should not impute income unless an obligor's voluntary change of employment is not "reasonable under all of the circumstances"; and (3) even if the underemployment guideline applied, Jody had failed to present relevant and reliable evidence of the prevailing wage in the community for a person with Keith's work history and qualifications. The trial court concluded that Keith's monthly income was $900, and reduced his child support obligation to $252 monthly. Jody appeals.

■ A trial court's modification of a child support award is a finding of fact that will not be reversed unless it is clearly erroneous. *Mahoney v. Mahoney*, 538 N.W.2d 189, 191–92 (N.D.1995). As we explained in *Mahoney*, a "finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if no evidence supports it or if, on the entire record, we are left with a definite and firm conviction that a mistake has been made."

1. *Voluntary & Temporary.*

■ Jody argues that the "trial court erred in granting modification of Keith's child support obligation as Keith's reduction in income was voluntary and temporary." We disagree. A voluntary change of employment resulting in a reduction of income does not, by itself, foreclose an obligor from seeking modification of a child support obligation.

Formerly, an obligor had to demonstrate a material change in circumstances before a child support order would be reduced. *See Sweeney v. Hoff*, 478 N.W.2d 9, 10 (N.D. 1991). A primary factor in determining whether such a change had occurred was whether there had been "a change in the financial circumstances of the parties." *Id.* Moreover, the voluntariness of the change was also considered when determining whether the change warranted modification of the support award. *See id.*; *Huffman v. Huffman*, 477 N.W.2d 594, 597 (N.D.1991); *see also Gabel v. Gabel*, 434 N.W.2d 722, 723 (N.D.1989) ("cause of change" was relevant factor, "including whether the change was permanent or temporary and whether it was due to a voluntary act or neglect on the part of the obligor"). Thus, under our prior opinions, the voluntary nature of Keith's change

in financial circumstances would have been a relevant factor to consider.

■ Now, however, our legislature has authorized and directed periodic review of all child support orders. *See Eklund v. Eklund,* 538 N.W.2d 182, 185–86 (N.D.1995); *see also Garbe v. Garbe,* 467 N.W.2d 740, 742–43 (N.D.1991). Consequently, an obligor only has to demonstrate a material change in circumstances to seek modification of a child support order within one year after its entry. NDCC 14–09–08.4(3); *see Mahoney,* 538 N.W.2d at 192. If the obligor properly seeks to modify an order after one year, NDCC 14–09–08.4(3) *requires* the trial court to modify the obligation "to conform the amount of child support payment to that required under the child support guidelines."

■ Keith did not have to prove a material change in circumstances because his support order was over one year old. Since Keith is entitled to periodic review of his child support obligation, it necessarily follows that he is not absolutely precluded from seeking the modification when, due to a voluntary change of employment, application of the guidelines to his present income will reduce his support obligation.

■ Jody asserts that the "appropriate relief for Keith's temporary reduction in income would be for a delay in making a portion of the child support payments rather than a permanent reduction in the child support payment." *See Schmidt v. Reamann,* 523 N.W.2d 70, 73 (N.D.1994); *Hartman v. Hartman,* 466 N.W.2d 155, 157 (N.D.1991). We agree that it will frequently be better to defer payment of part of the support payments, without reducing the obligation, when the obligor is temporarily unable to meet the obligation. However, considering the duration and extent of the reduction in Keith's income during more than two years since the last order, we do not believe that the trial court was clearly erroneous in deciding that a modification of this support order was justified.

Like Keith, Jody is entitled to seek modification of the support order at least annually. NDCC 14–09–08.4(3). If and when Keith's

business earns more, Jody can have the support increased accordingly.

2. *Underemployment Guideline.*

■ Jody argues that the trial court erred when it declared NDAC 75–02–04.1–07 unreasonable. We agree with Jody that this guideline remedy for underemployment was a reasonable exercise of the rule-making authority of the North Dakota Department of Human Services.

■ An obligor's ability to pay child support is not solely determinable from actual income, and an obligor's earning capacity also can be utilized, we have often recognized in our past decisions. *See Gabel,* 434 N.W.2d at 724; *Cook v. Cook,* 364 N.W.2d 74, 76 (N.D.1985); *Burrell v. Burrell,* 359 N.W.2d 381, 383 (N.D.1985); *Skoglund v. Skoglund,* 333 N.W.2d 795, 796 (N.D.1983). *See also Perry v. Perry,* 382 N.W.2d 628, 629 (N.D. 1986) (obligor, who "could seek and maintain employment which would allow him to meet his obligation for child support," could be held in contempt for failure to pay). The first child support guidelines did not specifically authorize imputation of income to an unemployed or underemployed parent. *See Heley v. Heley,* 506 N.W.2d 715, 722 (N.D. 1993); *Spilovoy v. Spilovoy,* 488 N.W.2d 873, 878 (N.D.1992). Yet, we explained in *Olson v. Olson,* 520 N.W.2d 572, 574 (N.D.1994), if "an obligor with an established earnings history voluntarily, without good reason, places himself in a position where he is unable to meet his child support obligations, income compatible with his prior earnings history may be imputed in calculating child support under the guidelines."

*Olson*'s "rule of reason," however, preceded the adoption of the specific child-support guideline allowing the imputation of income based on an obligor's earning capacity. *See id.* at 573 n. 1; *see also Schatke v. Schatke,* 520 N.W.2d 833 (N.D.1994). Effective January 1, 1995, the Department amended the guideline definition of "gross income" to include "income imputed based upon earning capacity," NDAC 75–02–04.1–01(5), and amended NDAC 75–02–04.1–07 to create methods for imputing income to an underemployed obligor.

For the guidelines, an "obligor is 'under-employed' if the obligor's gross income from earnings is significantly less than prevailing amounts earned in the community by persons with similar work history and occupational qualifications." NDAC 75–02–04.1–07(1)(b). An obligor is presumed to be "underemployed" if his or her gross earnings "is less than six-tenths of prevailing amounts earned in the community by persons with similar work history and occupational qualifications." NDAC 75–02–04.1–07(2). The guideline defines "community" as "any place within one hundred miles ... of the obligor's actual place of residence." NDAC 75–02–04.1–07(1)(a). If the obligor is "underemployed," income is imputed under NDAC 75–02–04.1–07(3), based on earning capacity, less actual gross earnings.[1]

Here, the trial court determined that NDAC 75–02–04.1–07 was "unreasonable and unnecessary and therefore in excess" of the Department's rule-making authority. Specifically, the court found "the huge size of the purported 'community' bears no rational relation to the availability of jobs within the area," and "no discretion is left to the Court to choose among available alternatives." Instead of using the underemployment guideline, the trial court used *Olson*'s pre-guideline "rule of reason." Finding Keith's decision to start his own business to be "reasonable under the facts of this case," the trial court did not impute any income to him.

■ The Legislature gave the Department broad statutory authority to establish child support guidelines:

The department of human services shall establish child support guidelines to assist courts in determining the amount that a parent should be expected to contribute toward the support of the child under this section. The guidelines must:

a. Include consideration of gross income.

b. Authorize an expense deduction for determining net income.

c. *Designate other available resources to be considered.*

d. Specify the circumstances which should be considered in reducing support contributions on the basis of hardship.

NDCC 14–09–09.7(1) (emphasis added). *See Eklund*, 538 N.W.2d at 187. As noted above, our pre-guidelines cases recognized that an obligor's earning ability was an available resource for setting child support. Thus, the amended guideline neither conflicts with our prior decisions, *see Hecker v. Stark County Social Serv. Bd.*, 527 N.W.2d 226, 232 (N.D. 1994), nor conflicts with, or exceeds the scope of, the statute authorizing the Department to establish child support guidelines. *See Little v. Tracy*, 497 N.W.2d 700, 704 (N.D.1993); *see also Spilovoy*, 488 N.W.2d at 878 ("If a minimum wage income should be imputed to a child support obligor under these circumstances, that argument is best made to the agency promulgating the guidelines and, if failing there, to the Legislature."). We disagree with the trial court that the Department exceeded its authority in amending NDAC 75–02–04.1–07 to authorize the imputation of income based on earning capacity.

■ The trial court ruled that the guideline definition of "community" was excessive. However, we cannot say that the Department acted arbitrarily or capriciously in adopting this definition. *See* NDCC 28–32–19.1(4); *see also Ames v. Rose Township Bd. Of Township Supervisors*, 502 N.W.2d 845, 851 (N.D.1993). While we understand the trial court's uneasiness with the wide scope of the

---

1. NDAC 75–02–04.1–07(3) directs:

Except as provided in subsections 4 and 5, monthly gross income based on earning capacity equal to the greatest of subdivisions a through c, less actual gross earnings, must be imputed to an obligor who is unemployed or underemployed.

a. An amount equal to one hundred sixty-seven times the hourly federal minimum wage.

b. An amount equal to six-tenths of prevailing gross monthly earnings in the community of persons with similar work history and occupational qualifications.

c. An amount equal to ninety percent of the obligor's greatest average gross monthly earnings, in any twelve months beginning on or after thirty-six months before commencement of the proceeding before the court, for which reliable evidence is provided.

definition of "community," we cannot substitute our view for that of the Department. *See Scherling v. Scherling*, 529 N.W.2d 879, 882 (N.D.1995). If application of the "community" definition proves to be too awkward, or if its effect turns out to be unfair, then improvements can and should be suggested to either the Department or the Legislature.

■ The trial court also ruled that the Department's adoption of the "underemployment" guideline was an improper intrusion into judicial discretion. In its Memorandum Opinion, the trial court complained that application of the guideline would effectively "rob the Judicial Branch of any meaningful discretion in child support cases ..." and "only a cruel illusion [of justice] would remain." We disagree that imputing income to a significantly underemployed obligor is an improper intrusion into judicial discretion, or that the imputation will hinder the administration of justice.

Obviously, the child support guidelines redefine the responsibilities once loosely delegated to the judiciary, but the Legislature rationally decided that greater specificity and uniformity were necessary in the determination and enforcement of child support payments. This particular guideline represents no more of an improper intrusion into judicial discretion than do any of the others.

■ Moreover, the new guideline still allows a court to exercise considerable discretion when determining whether an obligor meets the definition of "underemployed." *See* NDAC 75–02–04.1–07(1)(b) ("An obligor is 'underemployed' if the obligor's gross income from earnings is *significantly* less than *prevailing* amounts earned in the community by persons with *similar* work history and occupational qualifications." (emphasis added)). Under NDAC 75–02–04.1–07(2), an obligor is only *presumed* to be "underemployed" if he or she is earning less than sixty percent of the relevant "prevailing" wage in the "community." Under NDREv 301, a presumption is rebuttable and may be overcome by contrary evidence weighed by the judge. Judicial discretion thus continues.

■ We also disagree that imputing income to an underemployed obligor is some-

how "unjust." A parent has a duty to support his children to the best of his *abilities*, not simply to his inclinations.

The underemployment guideline represents the Department's effort to balance an obligor's freedom to make reasonable employment decisions with his duty to support his children diligently. An obligor is still free to switch jobs, or become self-employed. However, if that voluntary change results in the obligor becoming "underemployed," then the obligor who made the change should make a greater sacrifice than his children.

3. *Evidence of Underemployment.*

Keith asserts that even if we uphold NDAC 75–02–04.1–07, the trial court properly found that a self-employed obligor cannot be "underemployed" for purposes of imputing income. In support of the trial court's determination that a self-employed obligor cannot be "underemployed," Keith asserts that he is not "underemployed" because he "is continually working and looking for work and working when he has jobs available." We disagree.

■ The guideline definition of "underemployment" is tied to *earning capacity*, not to the amount of *time* the obligor works. Under NDAC 75–02–04.1–07(1)(b), a court can impute income to a self-employed obligor if that obligor's income is "significantly less than prevailing amounts earned in the community by persons with similar work history and occupational qualifications." However, we agree with Keith that this modification must be affirmed because the trial court ultimately found, if the guideline did apply, that Jody had failed to present sufficient competent evidence under NDAC 75–02–04.1–07(1)(b) to prove that Keith earned "significantly less than prevailing amounts earned" by similarly situated persons.

Accordingly, sufficient competent evidence of the relevant "prevailing amounts earned in the community" must be presented to the court for comparison with the obligor's "gross income from earnings." Absent adequate evidence, a court cannot find under NDAC 75–02–04.1–07 that an obligor is "un-

deremployed," and accordingly cannot impute income.

At the modification hearing, Keith testified that he was earning $10.50 per hour when he left Overhead Door in 1992. Keith also responded to these questions from Jody's counsel:

Q. So you've got about 13 years in experience or better in the door business.

A. Correct.

Q. Then you must have some idea of what the prevailing wage is that's paid to door installers in this area, is that not correct?

A. There is no rhyme or reason to prevailing wages on this occupation. The reason I say that is it depends on who you're working for.

Q. Do you know what Overhead Door is paying their installers, approximately?

A. I think the top paid guy is about eleven per hour.

Q. Okay. How about—are you familiar with Production Specialties here in Grand Forks?

A. Mm-hmm, yes.

Q. Do you know what they are paying their installers?

A. The last I heard, their top paid guy was between eight and nine.

Q. And when you say top paid, do you know what the lower paid person is, with the bottom of the scale?

A. I have no idea.

In addition, Jody asked the trial court to take judicial notice of the January 1995 edition of a North Dakota Job Service publication, the NORTH DAKOTA LABOR MARKET ADVISOR, that listed wages for manufacturing jobs in North Dakota at $10.47 per hour, and in the Fargo–Moorhead area at $10.21 per hour. See Blaine L. Nordwall, Child Support Guidelines Amended, THE GAVEL, February/March 1995, at 15 ("For most cases, the NORTH DAKOTA LABOR MARKET ADVISOR ... provides inexpensive, reliable, and judicially noticeable (under Rule 201, N.D.R.Ev.) evidence of earning potential. Unusual occupations are not listed."). Other than Keith's testimony and the Job Service publication,

Jody offered no other evidence of the relevant "prevailing" wage in Keith's "community" for those "with similar work history and occupational qualifications" to his.

Jody asserts: "Clearly sufficient evidence was presented to the trial court to establish that the prevailing amount earned in this community by a person with similar work history and occupational qualifications as Keith would be at least $10.50 per hour, the amount Keith was earning at the time Keith left Overhead Door." Using Keith's 1994 tax return to compute Keith's present hourly income at $4.99 per hour, Jody argues that Keith is presumptively "underemployed" under NDAC 75–02–04.1–07(2) because $4.99 per hour "is less than six-tenths of" $10.50 per hour. The trial court, however, discounted the reliability of Keith's testimony and the particular relevance of the Job Service publication, and specifically found that Jody had "provided no relevant nor reliable data to show what persons of [Keith's] work history and job qualifications are earning as a prevailing wage."

■■■ Our standard of review recognizes that the trial court is in a much better position to weigh the evidence and judge the credibility of witnesses. See Severson v. Hansen, 529 N.W.2d 167, 169 (N.D.1995); Schmidkunz v. Schmidkunz, 529 N.W.2d 857, 859 (N.D.1995). While we are unwilling to hold that an obligor's own testimony is never sufficient to establish the "prevailing" wage in a "community," we do not believe that it was clearly erroneous for the trial court to find that Keith's 1992 wage, and his estimates of what two companies were paying their "top" door installers in 1995, were insufficient to prove the relevant "prevailing" wage for Keith's work.

Jody asserts that the manufacturing wages shown in the Job Service publication "would be probative of the prevailing wages paid in the installation business as manufacturing would require similar aptitude and educational backgrounds, with no college or other specialized degree." At the modification hearing, however, Jody's counsel conceded that the "manufacturing industry" was "different from what [Keith is] doing now." The trial court specifically found that the publication

"provided no relevant evidence to [Keith's] occupation." While other editions of the monthly NORTH DAKOTA LABOR MARKET ADVISOR might give more relevant wage information for Keith's line of work, we do not believe that it was clear error for the trial court to discount the relevance of the manufacturing wages shown in the January 1995 edition.

Although the trial court erroneously concluded that the underemployment guideline was inappropriate and unreasonable, it was not clear error for the trial court to find that Jody had failed to present sufficient reliable and relevant evidence of the "prevailing" wage in the "community." Therefore, even under NDAC 75–02–04.1–07, the trial court properly refused to impute income to Keith. We affirm the modification reducing Keith's child support obligation.

NEUMANN, J., concurs.

MUEHLEN MARING, J., was not a member of the Court when this case was heard and did not participate in this decision.

VANDE WALLE, Chief Justice, concurring in result.

Under the guidelines it is apparently acceptable for the obligor who holds a "plum" job, i.e., a well paying job, to, without consequences except to the child, freely leave the job, accept a similar job at a lower pay rate but at a rate which nevertheless is not significantly less than the prevailing amounts earned in the community for persons with similar work history and qualifications. The holder of the plum job can leave it for a job that pays the average in the community and the obligor's support payments will be reduced accordingly.

Unless there was good reason to do so, the obligor could not leave the good paying job and have child support payment reduced under *Olson v. Olson*, 520 N.W.2d 572 (N.D. 1994). The "rule of reason" apparently no longer applies and, except within the first year after a support order, the reason for leaving the good-paying job is immaterial, even if the reason is to spite the custodial parent and guardian, so long as the obligor leaves for an average-paying position. Per-

haps, as the majority states, it is the Department of Human Services' "effort to balance an obligor's freedom to make reasonable employment decisions with his duty to support his children diligently." But if the employment decision must be reasonable, the rule of reason applies. It appears to me the decision to leave a high paying job for an average paying job may, in fact, be unreasonable but it will make no difference if the obligor is not underemployed as defined by the guidelines.

Under the guidelines as promulgated, I cannot disagree with the majority opinion. I concur in the result.

SANDSTROM, J., concurs.