1998 ND 141

**Candice M. HENRY, Plaintiff and Appellee,**

v.

**Paul E. HENRY, Defendant and Appellant.**

**Civil No. 970370.**

Supreme Court of North Dakota.

July 16, 1998.

Rehearing Denied Aug. 19, 1998.

Moosbrugger, Dvorak & Carter, Grand Forks, for plaintiff and appellee; argued by Shirley A. Dvorak.

Ward K. Johnson III, Grand Forks, for defendant and appellant.

MESCHKE, Justice.

[¶ 1] Paul Henry appealed a decree of divorce from Candice Henry to compel the trial court to order genetic paternity testing and to contest the amount of child support. We affirm and remand for consideration of Candice's request for attorney's fees on appeal.

[¶ 2] Mitchell Henry was born on February 13, 1995. His parents, Paul and Candice, were later married on April 21, 1995. From a previous marriage, Paul has a daughter living in Montana. When he married Candice, Paul was a Captain in the United States Air Force, stationed at the Grand Forks Air Force Base, and earned nearly $55,000 yearly as a navigator.

[¶ 3] In November 1995, Paul asked the Air Force to end his active duty on June 1, 1996. Paul attempted to withdraw this request on May 3, 1996, while he was on temporary assignment abroad. Paul returned to the Grand Forks Air Force Base on May 12, 1996 and, the next day, was arrested for domestic violence against Candice. As a result, the base commander denied Paul's request to remain on active duty on May 23, 1996, explaining:

> Although Captain Henry has a sound duty record, his conduct off-duty calls into question his suitability for continued military service. He has exhibited poor judgment in handling his personal affairs as evidenced by his arrest for domestic violence on 13 May 96. (Even though the matter will not be pursued by authorities at the request of his spouse).

Candice sued Paul for divorce on May 29, 1996, just two days before Paul separated from the Air Force.

[¶ 4] Candice moved for an interim order. Although Paul was unemployed when the motion was heard on June 27, 1996, the trial court found he "has a historical earning capacity of at least $3600.00 net per month," and "financial resources other than a monthly income to assist in the support of his son." Temporarily, the trial court placed primary physical custody of Mitchell with Candice and, effective June 1, 1996, ordered Paul to pay $586 monthly child support.

[¶ 5] When trial began April 17, 1997, Paul withdrew his claim for primary physical custody of Mitchell. At the August 6, 1997 continuation of the trial, Paul's testimony, for the first time, questioned Mitchell's paternity. On September 30, 1997, the trial court granted the divorce, placed physical custody of Mitchell with Candice, and ordered Paul to pay her child support of $586 monthly with $236 monthly to be accumulated in arrears while Paul attends law school. Paul appealed.

## I. Genetic Testing

[¶ 6] Paul argues he asked the trial court for genetic testing. He asserts the trial court's decision was erroneous for not ordering genetic testing to determine his paternity of Mitchell.

[¶ 7] Paternity is governed by the Uniform Parentage Act at N.D.C.C. ch. 14–17. "The natural father may be established under this chapter." N.D.C.C. § 14–17–03. "A man is presumed to be the natural father of a child if: ... [a]fter the child's birth, that man and the child's natural mother have married ... and ... [w]ith the man's consent, that man is named as the child's father on the child's birth certificate...." N.D.C.C. § 14–17–04(1)(c). Thus, Paul is presumed to be Mitchell's natural father. However, under N.D.C.C. § 14–17–04(2), that presumption can be rebutted "in an appropriate action only by clear and convincing evidence."

[¶ 8] Evidence that will rebut the presumption of paternity includes genetic testing.

The court may, and upon request of a party shall, require the child, mother, or alleged father to submit to genetic tests, including tests of blood or other tissues. The tests must be:

a. Of a type generally acknowledged as reliable by accreditation bodies designated by the secretary of the United States department of health and human services;

b. Performed by a laboratory approved by such an accreditation body; and

c. Performed by an expert qualified as an examiner of genetic data or specimens, appointed by the court.

N.D.C.C. § 14–17–10(1). Paul claims the trial court's failure to order genetic testing at his request "improperly denied [him] the remedy afforded by the statute to rebut the presumption of his paternity."

[¶ 9] In his brief, Paul insists his "request for a genetic paternity test was both sufficient and timely. There was eighteen questions and responses directed towards the issue of paternity at the August 6, 1997 hearing." We have carefully reviewed the entire trial transcript, including the specific testimony Paul references. While there was testimony about the subject of Mitchell's paternity, we find nothing to support Paul's position he requested the court to order genetic testing.

[¶ 10] "An application to the court for an order shall be by motion...." N.D.R.Civ.P. 7(b)(1). Paul did not move for genetic testing until his post-decree "Motion for Order for Genetic Paternity Test" on November 17, 1997. In his supporting brief then, Paul said he "stated during the proceedings that he was unsure whether he was the child's father because of the frequent misrepresentations made to him by [Candice], and also because he believes the minor child does not look like him." However, nowhere in that brief did Paul explain how he had moved during the trial to compel paternity testing. Because Paul's motion for genetic testing was made after the trial court had entered the divorce decree, and is still pending in the trial court, we conclude the subject of genetic testing is not here for review on this appeal.

## II. Child Support

### A.

[¶ 11] The trial court ordered Paul to pay Candice $586 monthly child support with $236 of that to accumulate in arrears while Paul attends law school. The amount of child support was based on Paul's "ability to earn a monthly net income of $3,600, and recognizing the child support obligation in the state of Montana."

[¶ 12] Paul contends the trial court erred in determining the amount of child support because

(1) there was no determination of the presumptively correct amount of support, (2) there was insufficient evidence to support a finding of underemployment, and (3) the order was in error even if the trial court properly determined underemployment.

Child support determinations are findings of fact subject to review under the "clearly erroneous" standard. N.D.R.Civ.P. 52(a); *Hieb v. Hieb,* 1997 ND 171, ¶ 6, 568 N.W.2d 598 (citing *Wolf v. Wolf,* 557 N.W.2d 742, 744 (N.D.1996)). A finding is clearly erroneous if it is based on an erroneous view of the law, if no evidence supports it, or if the entire record leaves the reviewing court with a definite and firm conviction a mistake has been made. *Nelson v. Nelson,* 547 N.W.2d 741, 743 (N.D. 1996). In *Hieb* at ¶ 7 (citations omitted), we summarized the method for determining the amount of support due:

> Child support determinations are governed by N.D.A.C. Chapter 75–02–04.1. A correct finding of an obligor's net income is essential to determining the proper amount of child support. To determine the proper amount of support owed, the court must first determine the obligor's net income from all sources and the number of children to be supported. After the obligor's net income is established, that amount is applied to the Guidelines to determine the proper amount of child support. The amount prescribed by the Guidelines enjoys a rebuttable presumption of correctness.

### B.

[¶ 13] Paul argues the trial court erred by failing to order the presumptively correct amount of child support under the North Dakota Child Support Guidelines. Candice admits the trial court did not order the presumptive amount for Paul's current earnings, but instead "properly considered evidence of earning capacity," found Paul underemployed, and imputed income from that evidence to set child support.

[¶ 14] The Guidelines define an underemployed parent who is obligated to pay child support:

> An obligor is "underemployed" if the obligor's gross income from earnings is signifi-

cantly less than prevailing amounts earned in the community by persons with similar work history and occupational qualifications.

N.D.Admin.Code 75–02–04.1–07(1)(b). Furthermore, an obligor is presumed to be underemployed "if the obligor's gross income from earnings is less than sixth-tenths of prevailing amounts earned in the community by persons with similar work history and occupational qualifications." N.D.Admin.Code 75–02–04.1–07(2). "If the obligor is 'underemployed,' income is imputed under NDAC 75–02–04.1–07(3), based on earning capacity, less actual gross earnings." *Nelson,* 547 N.W.2d at 745 (footnote omitted). In *Nelson* at 746 (emphasis original), we discussed why the guidelines authorize a court to impute income to an underemployed parent:

> A parent has a duty to support his children to the best of his *abilities,* not simply to his inclinations.

> The underemployment guideline represents the Department's effort to balance an obligor's freedom to make reasonable employment decisions with his duty to support his children diligently. An obligor is still free to switch jobs, or become self-employed. However, if that voluntary change results in the obligor becoming "underemployed," then the obligor who made the change should make a greater sacrifice than his children.

[¶ 15] A trial court has "considerable discretion when determining whether an obligor meets the definition of 'underemployed.'" *Nelson,* 547 N.W.2d at 746. We conclude it was within the trial court's discretion in this case to find Paul underemployed.

### C.

[¶ 16] Candice insists the trial court "properly determined the amount of child support to be paid" based on "evidence of the income earned by those with similar experience and skill; the military leave and earnings statement shows what [Paul] could have earned and what those with similar skill and experience could earn under the military's pay scale." Paul argues, however, the court

erred because "[n]o witness was called, or testimony presented, to establish what a person with qualifications and work history similar to Paul could earn in the community." He contends the trial court cannot impute income based on his former employment because he is no longer able to navigate tankers for the Air Force. Alternatively, he claims imputation at a navigator's salary is improper because the Air Force is phasing out navigator's positions. We do not agree.

[¶ 17] As Colonel Ebert, Paul's supervising officer at Grand Forks Air Force Base, testified, the trial court found the Colonel "considered Paul to be one of the top five out of 150 navigators," he "had extremely strong potential for promotion to Major," but "the Air Force considered Paul's discharge from the military a voluntary separation." After "his separation from the Air Force," the court found "Paul has worked as a used car salesman, a building manager and as a law clerk" before he began law school over a year later. The court also found Paul "admits that he has not taken any steps to secure employment that would provide him with approximately the same income as he had in the military. Likewise, he has not applied for a position with the National Guard, even though Colonel Ebert testified that he would be qualified." Indeed, when counsel asked Paul, "[w]hat other professional position or positions for which you are qualified for, have you applied for?", Paul answered, "I did not apply for any jobs."

■ [¶ 18] But, "[i]mplied in the guideline schedule and a parent's duty to support their children is the assumption that an obligor with a demonstrated ability to earn income and support his children at a certain level will continue to do so unless he can establish legitimate reasons for a change." *Schatke v. Schatke*, 520 N.W.2d 833, 837 (N.D.1994)(citing *Olson v. Olson*, 520 N.W.2d 572 (N.D. 1994)). In testifying extensively about Paul's ability, Colonel Ebert recognized, although Paul was no longer eligible to fly for the Air Force, he was capable enough "to go into any type of management position [with] any organization that he would like to go to." Therefore, we conclude it was reasonable for the trial court to infer Paul was thus capable of

earning at least $3600 net monthly because a person with his abilities could earn that amount outside of the Air Force as well.

[¶ 19] Even if Paul was no longer in the Air Force, his work history and qualifications demonstrated an ability to earn at that level, like others did in the Grand Forks community. Even if he might not find the same work there, it was reasonable on this record for the trial court to infer he had the capacity to do other work there that would earn comparably. Therefore, we affirm the trial court's finding Paul was underemployed.

[¶ 20] Under N.D.Admin.Code 75–02–04.1–07(2), Paul was presumed to be underemployed because his "gross income from earnings is less than six-tenths of prevailing amounts earned in the community by persons with similar work history and occupational qualifications." The trial court found Paul had "the ability to earn over $50,000" annually or, effectively, a gross exceeding $4167 monthly. Sixth-tenths of $4167 would be $2500 monthly. The trial court found Paul's actual earnings at the time of trial were $1325, but his earnings would be only $225 from part-time employment when he began law school soon. Paul's current actual earnings were certainly "less than" $2500 monthly, and authenticate the finding that Paul was underemployed.

### D.

[¶ 21] When an obligor is underemployed, the guidelines authorize several ways to impute income and direct the court to use the greatest of those ways:

Except as provided in subsections 4 and 5, monthly gross income based on earning capacity equal to the greatest of subdivisions a through c, less actual gross earnings, must be imputed to an obligor who is unemployed or underemployed.

a. An amount equal to one hundred sixty-seven times the hourly federal minimum wage.

b. An amount equal to six-tenths of prevailing gross monthly earnings in the community of persons with similar work history and occupational qualifications.

c. An amount equal to ninety percent of the obligor's greatest average gross monthly earnings, in any twelve months beginning on or after thirty-six months before commencement of the proceeding before the court, for which reliable evidence is provided.

N.D.Admin.Code 75–02–04.1–07(3). Under subsection (b), Paul's imputed monthly gross income would be $2500 ($4167 × .6). Under subsection (c), Paul's imputed monthly gross income would be $4,143.46 ($4,603.85 × .9).[1] Imputation under subsection (c) yields the greatest monthly gross income that the guidelines direct to compute child support.

[¶ 22] The amount of child support is computed on the obligor's net income and the number of children to be supported. N.D.Admin.Code 75–02–04.1–10. The trial court imputed $3600 monthly net income to Paul. This net amount is consistent with an imputed gross amount of $4,143.46. *See Berg v. Ullman*, 1998 ND 74, ¶ 23, 576 N.W.2d 218 (method of calculating net income from gross). A monthly net income of $3600 would result in a support obligation of $669 for one child. N.D.Admin.Code 75–02–04.1–10. The trial court, however, ordered child support in the lesser amount of $586, "recognizing the child support obligation in the state of Montana."[2] *See* N.D.Admin.Code 75–02–04.1–06.1. We are not convinced the trial court made a mistake by ordering child support of $586 monthly. Therefore, we affirm the trial court's child support order.

### E.

[¶ 23] Paul complains the trial court acted arbitrarily by "establishing the accumulation of arrearages of $236 per month for the three years to follow while he attends law school," claiming the arrearage interferes with his "opportunity for a yearly review of child support obligations" under N.D.C.C. § 14–09–08.4(3). However, nothing in this order precludes either Paul or Candice from seeking a modification at least annually.

[¶ 24] A delay in paying a portion of the support ordered is appropriate when the obligor has a temporary reduction in income, we have said, because

it will frequently be better to defer payment of part of the support payments, without reducing the obligation, when the obligor is temporarily unable to meet the obligation.

*Nelson v. Nelson*, 547 N.W.2d 741, 744 (N.D. 1996). Here, Paul's income has been temporarily, and voluntarily, reduced below his capacity while he attends law school for three years.

[¶ 25] At trial, Paul claimed his earnings would be meager for only a few years. He claimed his law degree will enable him, in time, to earn a salary commensurate with his former Air Force salary, enabling him to support Mitchell accordingly. Therefore, based on Paul's temporarily reduced actual earnings, we conclude the accumulation of arrears while Paul attends law school was appropriate, and we affirm it.

### III. Attorney Fees

[¶ 26] Concluding "Paul's custody action and Motion for Summary Judgment were without merit," the trial court ordered Paul to pay $4900 towards Candice's attorney's fees through trial. Candice seeks reasonable attorney's fees for this appeal. Paul did not respond to this request. "Although we have concurrent jurisdiction with the trial court to decide this issue, we have recognized the trial court is generally in a better position to consider the relevant factors." *Wagner v. Wagner*, 1998 ND 117, ¶ 11, 579 N.W.2d 207, (citing *Withey v. Hager*, 1997 ND 225, ¶ 10, 571 N.W.2d 142). Therefore, we remand for the trial court to consider Candice's request for attorney's fees.

### IV. Conclusion

[¶ 27] We affirm the trial court's decree ordering Paul to pay $586 monthly in child

---

1. The record includes reliable evidence of Paul's greatest gross monthly earnings. His military pay stub for the month of April 1996, showed a gross monthly income of $4,603.85, and a year to date income of $18,415.40 ($4,603.85 monthly).

2. Neither Candice nor Paul questioned the amount of this reduction for Paul's obligation for a second child.

support, with $236 monthly to accumulate in arrears while he attends law school. We remand for consideration of Candice's request for attorney's fees for this appeal.

[¶ 28] VANDE WALLE, C.J., and MARING and NEUMANN, JJ., concur.

SANDSTROM, Justice, concurring and dissenting.

[¶ 29] Because the evidence does not establish Paul Henry is underemployed for the purposes of the Child Support Guidelines, I respectfully dissent to part II of the majority opinion.

[¶ 30] Before Candice Henry filed for divorce, Paul Henry had filed to voluntarily separate from the Air Force. Subsequently, he sought to withdraw his request to separate from the Air Force, but the Air Force refused his request to stay in. He cannot earn the salary as an Air Force tanker navigator now that he is out of the Air Force and cannot get back in, yet the majority imputes a salary to him based on his salary as an Air Force tanker navigator.

[¶ 31] As Candice Henry points out in her brief:

"The trial court determined that the Appellant had the ability to earn a monthly net income of $3,600, and the trial court established the Appellant's monthly child support obligation at $586.00 per month. (App. at 32). *The trial court made this determination based upon one of the Appellant's armed forces leave and earnings statements.* (App. at 69)."

(Emphasis added).

[¶ 32] Under the Guidelines:

"An obligor is 'underemployed' if the obligor's gross income from earnings is significantly less than prevailing amounts earned *in the community* by persons with similar work history and *occupational qualifications*."

N.D. Admin. Code § 75–02–04.1–07(1)(b) (emphasis added). Because being in the Air Force (or the ability to get back in) is a necessary occupational qualification for being an Air Force tanker navigator, Paul Henry lacks the necessary occupational qualification for that position. What was done here is equivalent to imputing the prevailing salary of orthopedic surgeons in the community to an obligor whose license to practice medicine had been revoked. At oral argument, Candice Henry conceded such imputation would be improper.

[¶ 33] The majority refers to testimony of the supervising officer suggesting Paul Henry might be able to get a position as a National Guard tanker navigator. Yet there is no evidence such a position is available in the "community," which the Guidelines define as "any place within one hundred miles [160.93 kilometers] of the obligor's actual place of residence." N.D. Admin. Code § 75–02–04.1–07(1)(a).

[¶ 34] The majority asserts, at ¶ 19:

"Even if Paul was no longer in the Air Force, his work history and qualifications demonstrated an ability to earn at that level, like others did in the Grand Forks community. Even if he might not find the same work there, it was reasonable on this record for the trial court to infer he had the capacity to do other work there that would earn comparably."

The problem with the majority's bald assertion is there is no evidence Paul Henry was able to earn at that level of salary outside of the Air Force in the Grand Forks community. Nor was there any evidence "others ... in the Grand Forks community" with similar work history and occupational qualifications, outside of the Air Force, "earn at that level."

[¶ 35] I concur in part I of the majority opinion. I would remand for calculation of child support consistent with the Guidelines.

[¶ 36] Dale V. Sandstrom