2009 ND 35

**Jeffrey T. VERHEY, Plaintiff, Appellee, and Cross– Appellant**

v.

**Jacquelyn K. McKENZIE, f/k/a Jacquelyn K. McKenzie–Verhey, Defendant, Appellant, and Cross–Appellee.**

**No. 20070234.**

Supreme Court of North Dakota.

April 2, 2009.

Tom P. Slorby, Slorby Law Office, Minot, ND, for plaintiff, appellee, and cross-appellant.

Richard B. Baer, Richard B. Baer, P.C., Bismarck, ND, for defendant, appellant, and cross-appellee.

CROTHERS, Justice.

[¶ 1]   Jacqueline K. McKenzie appeals, and Jeffrey T. Verhey cross-appeals, from an amended judgment ordering McKenzie to pay $3,334 per month child support. We reverse and remand for recalculation of McKenzie's child support obligation, concluding the district court erred in failing to apply the child support guidelines.

I

[¶ 2]   McKenzie and Verhey were married in March 1990, divorced in January 1998 and had three children together.   In the divorce judgment, McKenzie was awarded custody of the children, and Verhey received visitation and paid child support.   Verhey and McKenzie were both licensed physicians practicing in Minot.   In April 2006, McKenzie was arrested and charged with possession of illegal drugs.   Prior to her arrest, McKenzie was licensed and had a gross annual income in excess of $250,000.   After her arrest, McKenzie's medical license was suspended and later revoked.   McKenzie lost her full-time employment as a pathologist.   McKenzie ultimately pled guilty to the drug charges and was on probation at the time of the district court hearing in this case.

[¶ 3]   After McKenzie's arrest, Verhey moved the district court for an ex parte order for a change of custody, giving him immediate custody of the children and suspending his child support obligation.   Verhey also moved the court to amend the divorce judgment to award him custody, terminate his child support obligation, and require McKenzie to pay child support under the child support guidelines.   Verhey and McKenzie thereafter stipulated to the change in custody.   On April 17, 2007, a hearing was held on the stipulation and to determine McKenzie's child support obligation.   The district court found a permanent change of custody was in the best interests of the minor children.

[¶ 4]   Regarding McKenzie's child support obligation, the district court concluded that although McKenzie was unemployed, she was living a "lifestyle" requiring a net income of at least $9,800 per month.   On that basis and under its application of the child support guidelines the court ordered McKenzie to pay child support of $3,334 per month.   Despite finding McKenzie was unemployed at the time of the hearing, the court found she had been living on her significant investments and savings.   McKenzie made a motion to

reconsider, which the district court denied. Both parties appealed from the district court's amended judgment.

## II

[¶ 5] McKenzie argues the district court erred in its application of the child support guidelines. "Child support determinations involve questions of law which are subject to the de novo standard of review, findings of fact which are subject to the clearly erroneous standard of review, and may, in some limited areas, be matters of discretion subject to the abuse of discretion standard of review." *Buchholz v. Buchholz*, 1999 ND 36, ¶ 11, 590 N.W.2d 215. "If the district court fails to comply with the child support guidelines in determining an obligor's child support obligation, the court errs as a matter of law." *Serr v. Serr*, 2008 ND 56, ¶ 18, 746 N.W.2d 416; *Knoll v. Kuleck*, 2004 ND 199, ¶ 5, 688 N.W.2d 370.

"Child support determinations are governed by N.D.A.C. Chapter 75–02–04.1. A correct finding of an obligor's net income is essential to determining the proper amount of child support. To determine the proper amount of support owed, the court must first determine the obligor's net income from all sources and the number of children to be supported. After the obligor's net income is established, that amount is applied to the Guidelines to determine the proper amount of child support. The amount prescribed by the Guidelines enjoys a rebuttable presumption of correctness."

*Henry v. Henry*, 1998 ND 141, ¶ 12, 581 N.W.2d 921 (quoting *Hieb v. Hieb*, 1997 ND 171, ¶ 7, 568 N.W.2d 598 (citations omitted)). Section 75–02–04.1–02(10),

N.D. Admin. Code, requires that a "child support order ... include a statement of the [obligor's] net income ... used to determine the child support obligation, and how that net income was determined." [1]

[¶ 6] At the hearing, McKenzie testified she made $260,000 in 2004, $295,000 in 2005, but had reduced wages of about $107,000 in 2006 after she lost her job. The 2006 wages represent about three and a half months of employment. The parties do not dispute this income information, which is supported by exhibits admitted into evidence at the hearing including McKenzie's tax returns for 2005 and 2006 and a two-year comparison worksheet containing McKenzie's 2004 income information.

[¶ 7] Rather than imputing an amount as calculated under N.D. Admin. Code § 75–02–04.1–07, the district court extrapolated McKenzie's income based on McKenzie's "lifestyle" and on the use of her assets to maintain this lifestyle. The court found from the evidence of McKenzie's expenses that although McKenzie had lost her employment, she had not adjusted her lifestyle or her standard of living. The court concluded, "If McKenzie opts to live a lifestyle that requires approximately $10,000 per month to maintain, she should pay child support based on a similar standard."

[¶ 8] The district court continued:

"Neither party has submitted any analysis regarding the tax consequences of McKenzie's activities. No testimony was presented at trial regarding the taxes McKenzie would pay on gains realized by her when liquidating retirement accounts, nor has any information been provided for what will happen when she

---

1. Various Child Support Guidelines addressed in this case were amended effective October 1, 2008, subsequent to this district court's decision in this case. N.D. Admin. Code ch. 75–02–04.1 (effective October 1, 2008). This opinion addresses the guidelines in effect at the time of the motion and the district court's hearing and decision.

begins to invade her retirement accounts in order to maintain her present lifestyle. Completing a child support guideline worksheet in this vacuum, is not a useful exercise.

"What is clear from the evidence presented, and what is available to the Court from the evidence presented, however, and by McKenzie's own financial affidavit, she is living a lifestyle that would require a net income of at least $9,800 per month. The Court will therefore establish child support in the amount of $3,334 per month, in accordance with the child support guidelines."

[¶ 9] Generally, the child support provided for under the guidelines is presumed to be the correct amount. *See* N.D. Admin.Code § 75–02–04.1–09(1). We have held, "The child support guidelines plainly and directly prohibit a court from using an obligor's daily living expenses when setting child support." *Schmalle v. Schmalle*, 1998 ND 201, ¶ 16, 586 N.W.2d 677 (citing *Jarvis v. Jarvis*, 1998 ND 163, ¶ 32, 584 N.W.2d 84; *Horner v. Horner*, 549 N.W.2d 669, 670 (N.D.1996)). The district court here, however, did not follow the guidelines to calculate a net income amount for McKenzie, but instead arrived at an amount based on her expenses and on her spending from savings and investment accounts. Although the district court in denying McKenzie's motion for reconsideration indicated that McKenzie's use of her investments and savings was a non-recurrent payment, the court provided no determination of net income substantiating this calculation, instead relying on its initial determination based upon McKenzie's lifestyle.

[¶ 10] The method for computing the support obligation for an unemployed or an underemployed obligor is set forth in N.D. Admin. Code § 75–02–04.1–07(3), which stated:

"3. Except as provided in subsections 4, 5, and 9, gross income based on earning capacity equal to the greatest of subdivisions a through c, less actual gross earnings, must be imputed to an obligor who is unemployed or underemployed.

a. A monthly amount equal to one hundred sixty-seven times the hourly federal minimum wage.

b. An amount equal to six-tenths of prevailing gross earnings in the community of persons with similar work history and occupational qualifications.

c. An amount equal to ninety percent of the obligor's greatest average gross monthly earnings, in any twelve consecutive months beginning on or after thirty-six months before commencement of the proceeding before the court, for which reliable evidence is provided."

"Under this guideline, the subsection resulting in the greatest imputed income must be used." *Hoff v. Fitterer*, 2005 ND 186, ¶ 6, 705 N.W.2d 807; *see also Buchholz*, 1999 ND 36, ¶ 14, 590 N.W.2d 215. Thus, the guidelines require McKenzie's gross income be based on earning capacity "equal to the greatest of subdivisions a through c" under N.D. Admin. Code § 75–02–04.1–07(3), which in this case, based upon the record and unrefuted income tax returns, is N.D. Admin. Code § 75–02–04.1–07(3)(c).

[¶ 11] McKenzie argued to the district court that under N.D. Admin. Code § 75–02–04.1–07(6), the court should impute income at the minimum wage. Section 75–02–04.1–07(6), N.D. Admin. Code, stated:

"If an unemployed or underemployed obligor shows that employment opportunities, which would provide earnings at least equal to the lesser of the amounts

determined under subdivision b or c of subsection 3, are unavailable in the community, income must be imputed based on earning capacity equal to the amount determined under subdivision a of subsection 3, less actual gross earnings." Based upon this guideline's language, McKenzie has the burden to establish these circumstances. *See Orvedal v. Orvedal,* 2003 ND 145, ¶ 12, 669 N.W.2d 89 (holding district court did not err in finding obligor had failed to present sufficient evidence to warrant a finding that amounts available under subdivision b or c of subsection 3 were unavailable in the community). Although the district court concluded "[n]o employment opportunities exist for a physician without a license," the record lacks evidence showing any "prevailing gross earnings in the community" with respect to someone with McKenzie's work history and occupational qualifications. *See* N.D.C.C. § 75–02–04.1–07(3)(b). "Community" was defined at N.D. Admin. Code § 75–02–04.1–07(1)(a) as "any place within one hundred miles . . . of the obligor's actual place of residence."

[¶ 12] At the April 2007 hearing, McKenzie testified she was unlicensed and unemployed, but that she has a bachelor's degree in microbiology, a medical doctor degree and specialized training in pathology, which included clinical and anatomic pathology. McKenzie indicated that before her arrest she was board certified in pathology and was licensed to practice medicine in North Dakota. She also testified regarding her efforts to seek employment subsequent to the revocation of her medical license:

BY MR. SLORBY:

Q   Have you sought any other employment since your license was suspended and ultimately revoked?

A   Well, I have been looking on the Internet for sub-specialty fellowships in pathology and I know that I need a license so I need to find out some legal advice about the special circumstances that I am in in order to get a license for training purposes.

Q   I suppose I should ask you, what was your bachelor's degree in?

A   Microbiology.

Q   I kind of suspected something like that. Did you have a bachelor of arts or bachelor of science degree?

A   It is arts, I think.

Q   Not a teaching degree?

A   No.

. . . .

EXAMINATION BY MR. BAER:

Q   Do you have any idea when your employment status or employment situation will change?

A   At this time I don't have any idea especially if I want to do a sub-specialty fellowship. You have to apply here before you begin the fellowship and I have got to find out licensing issues and things like that.

Q   When you talk about licensing issues, are those qualifications to receive some kind of permission to receive the grant or to do the study work or to work in that field or what?

A   Yeah, you have to have a license.

Q   In what?

A   Medical. General medical license to do any of these fellowships.

Q   When you say a general medical.

A   Unrestricted.

Q   General medical license is that a medical practitioner kind of a license or is it something less than an M.D. requirement?

A   Not, it is an M.D. requirement.

Q   And right now you don't meet those qualifications for that occupation, is that correct?

A   That's correct.

Q   And you did say in the future you would be allowed to reapply but is there any definition as to the future?

A   They didn't give me any dates or anything.

Q   Is that future reapplication dependent upon how you do on your probation and how that ultimately ends up?

A   Yes, it does.

Q   So applying for a fellowship or some such thing at this point is not do-able probably based upon the circumstances?

A   It would be—it would involve a lot of communication and talk and it would depend on how much they needed a person at that particular place and that is pretty slim.

Q   When you say they, who would they be?

A   Well, wherever I applied for the fellowship.

Q   For example, where could you apply or would you apply?

A   Well, there are fellowships pretty much all over the country in most every state.

Q   Insofar as—so as far as your employment circumstances right now, and I believe Mr. Slorby asked you about have you applied for any other work or employment?

A   No.

Q   So there—other than the fellowships, nothing—is there any thought or plan on doing that?

A   There are thoughts, yes. Plans, well-made plans are not in the works yet.

Q   Are there other employment options that are available to you?

A   Well, you know, if you just look through the classifieds there are all sorts of jobs and things that I could apply for. I don't know.

. . . .

Q   But as it now stands you are not—you are occupationally not qualified, correct?

A   That's correct.

Q   And your future is—for employment in the medical field at least is pretty—pretty unlikely?

A   Hopefully in the future sometime but not in the immediate future.

. . . .

REDIRECT EXAMINATION BY MR. SLORBY:

Q   Have you explored practicing medicine or pathology in another country?

A   I have not done that, no.

Q   You would be qualified to teach at least at the college level?

THE WITNESS: Okay.

THE COURT: That was a question. Do you know if that is true?

THE WITNESS: I don't know for sure.

BY MR. SLORBY:

Q   Well, you don't need a license to teach.

A   Okay. I probably would.

Q   Either microbiology or something else connected with your education?

A   Um hum.

Q   You are qualified to be a consultant in pathology, correct?

A   I would hope that I would be credible, but yes.

Q   You are qualified to be, for instance, a pathology lab assistant?

A   Well, I don't know. They have their special licenses and things. So I would probably have to get a license for that. I am kind of considering trying to do what techs do and screen pap smears but I wouldn't know how to go about that either.

. . . .

[¶ 13] McKenzie's testimony does establish that she may be unable to obtain employment which requires a license in the medical field. However, McKenzie's testimony does not establish what her income from earnings would be compared to "prevailing gross earnings in the community" by other persons with "similar work history and occupational qualifications" as required under N.D. Admin. Code § 75–02–04.1–07(1)(b). This Court has said that prevailing wage surveys from Job Service North Dakota could provide such evidence. *See, e.g., Orvedal,* 2003 ND 145, ¶ 12, 669 N.W.2d 89; *Berg v. Ullman,* 1998 ND 74, ¶ 18, n. 2, 576 N.W.2d 218; *Kjos v. Brandenburger,* 552 N.W.2d 63, 65–66 (N.D. 1996). McKenzie's testimony further suggests that while she has explored potential employment possibilities, she has not taken steps to actually seek employment. The district court appears to have assumed that McKenzie would be underemployed in whatever employment she eventually obtained, but merely showing the loss of her medical license does not meet McKenzie's burden under N.D. Admin. Code § 75–02–04.1–07(6). Based upon this record, therefore, McKenzie's income should be imputed under N.D.C.C. § 75–02–04.1–07(3)(c). However, if on remand the district court in its discretion opens the record to take additional evidence, the court may give further consideration to N.D. Admin. Code § 75–02–04.1–07(6).

[¶ 14] Although the district court in denying McKenzie's motion for reconsideration indicated that McKenzie's use of her investments and savings was a non-recurrent payment, the court provided no determination of net income substantiating this calculation, instead relying on its initial determination based upon McKenzie's lifestyle. If the district court were to have properly found that deviating from a pre-sumptively correct child support amount was necessary based upon McKenzie's various asset transactions, the court still would be required to apply the guidelines. " 'The list of criteria for rebutting the presumption is exclusive,' and the 'party urging a deviation from the presumptively correct amount of child support has the burden of proof.' " *Hanson v. Hanson,* 2005 ND 82, ¶ 28, 695 N.W.2d 205 (quoting *Schmalle v. Schmalle,* 1998 ND 201, ¶ 15, 586 N.W.2d 677). "The exclusive list of the criteria for rebutting the presumption is listed at N.D. Admin. Code § 75–02–04.1–09(2)." *Hanson,* at ¶ 28. A court is permitted to deviate from a guideline amount upon proof by a preponderance of the evidence that deviation is appropriate. That deviation must be supported by specific findings that the presumption under the guidelines has been rebutted. *See* N.D.C.C. § 14–09–09.7(3).

[¶ 15] Here, the district court concluded it was necessary to consider McKenzie's use of her invested money, "including the principal [sic] and not merely the interest, . . . as a resource, income, for guideline purposes." The court was clearly troubled by McKenzie's lifestyle and thus chose to deviate from the child support guidelines by concluding that McKenzie maintains a lifestyle requiring expenditures of at least $9,800 per month.

[¶ 16] Section 75–02–04.1–09, N.D. Admin. Code, provides the criteria for rebuttal of the presumptively correct amount of child support calculated under the guidelines based upon an obligor's assets and asset transactions. Although the district court looked to McKenzie's use of her assets in maintaining her lifestyle, the court did not make specific findings to establish its calculation of a net income based upon the guidelines, nor did it establish that McKenzie's monthly spending on her lifestyle rebutted the guideline amount. The

district court, therefore, erred as a matter of law in computing McKenzie's net income.

[¶ 17] Because the district court did not calculate a net income amount, and because the court rejected imputing income to McKenzie under N.D. Admin. Code § 75–02–04.1–07(3)(c), the district court erred in calculating the amount of McKenzie's child support obligation. We therefore reverse and remand to the district court for further consideration consistent with the child support guidelines.

### III

[¶ 18] In his cross-appeal, Verhey asserts the district court should impute income to McKenzie under N.D. Admin. Code § 75–02–04.1–07(9). Verhey argues McKenzie's decisions to possess illegal drugs, resulting in the termination of her employment, and to remain unemployed while living on her savings could be considered a "voluntary change in employment" reducing her income, so as to permit the district court to impute income under N.D. Admin. Code § 75–02–04.1–07(9). Verhey also acknowledges this Court has previously held that imputation of income under this section is inappropriate when an obligor concedes that the obligor is unemployed, which is the circumstance here.

[¶ 19] At the time of Verhey's motion, N.D. Admin. Code § 75–02–04.1–07(9) stated:

"9. Notwithstanding subsections 4, 5, and 6, if an obligor makes a voluntary change in employment resulting in reduction of income, monthly gross income equal to one hundred percent of the obligor's greatest average monthly earnings, in any twelve consecutive months beginning on or after thirty-six months before commencement of the proceeding before the court, for which reliable evidence is provided, less actual monthly gross earnings, may be imputed without a showing that the obligor is unemployed or underemployed."

This Court has held whether to impute income under N.D. Admin. Code § 75–02–04.1–07(9) is within the district court's discretion. *See Geinert v. Geinert,* 2002 ND 135, ¶ 18, 649 N.W.2d 237. This Court has also said, however, that when an obligor's status as unemployed is conceded, N.D. Admin. Code § 75–02–04.1–07(3) must be used for purposes of imputing income because § 75–02–04.1–07(9) does not apply. *See Interest of D.L.M.,* 2004 ND 38, ¶ 5, 675 N.W.2d 187; *Minar v. Minar,* 2001 ND 74, ¶ 24, 625 N.W.2d 518. We decline Verhey's invitation to revisit our prior holdings.

[¶ 20] Nonetheless, the district court did not rely upon N.D. Admin. Code § 75–02–04.1–07(9) as a basis for imputing income to McKenzie, and further it was undisputed that McKenzie was unemployed. Therefore, on remand the district court should calculate imputed income under N.D. Admin. Code § 75–02–04.1–07(3), rather than under N.D. Admin. Code § 75–02–04.1–07(9).

### IV

[¶ 21] We have considered the remaining arguments raised by the parties, and conclude it is unnecessary to address those issues. We reverse the district court's amended judgment and remand for recalculation of McKenzie's child support obligation.

[¶ 22] GERALD W. VANDE WALLE, C.J., MARY MUEHLEN MARING, CAROL RONNING KAPSNER, and DALE V. SANDSTROM, JJ., concur.